## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| STEPHEN B. GRANT, on behalf of the United States of America and on behalf of the State of Iowa, | ) ) ) | Case No. 4:18-cv-00095-SMR-SBJ |
| Plaintiff/Relator, | ) ) ) ) | ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, PLAINTIFF'S MOTION |
| v. | ) ) ) | FOR PARTIAL SUMMARY JUDGMENT, DEFENDANTS' MOTION |
| STEVEN K. ZORN; IOWA SLEEP DISORDERS CENTER, P.C.; and IOWA CPAP, L.L.C., | ) ) ) ) | TO EXCLUDE DR. NIZAR SULEMAN, and PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS |
| Defendants. | ) ) | |

Plaintiff-Relator Stephen B. Grant ("Relator") brings this *qui tam* lawsuit as a whistleblower on behalf of the United States of America and the State of Iowa alleging his former employer committed violations of the False Claims Act ("FCA"), the federal Anti-Kickback Statute, and the Stark Law before retaliating against him for reporting such transgressions. Both parties move for partial summary judgment. Defendants also request that the Court exclude the report of Relator's expert witness while Plaintiff-Relator seeks sanctions for Defendants' prior representations concerning discovery deadlines. The parties did not request a hearing on these matters and the Court concludes they can be resolved without the benefit of oral argument. *See* LR 7(c). For the reasons discussed below, Defendants' Motion for Summary Judgment, [ECF No. 51], is GRANTED in part and DENIED in part. Relator's Motion for Partial Summary Judgment, [ECF No. 52], is DENIED. Defendants' Motion to Exclude Dr. Nizar Suleman, [ECF No. 69], is GRANTED in part and DENIED in part. Relator's Motion for Rule 11 Sanctions, [ECF No. 83], is DENIED.

## I.    BACKGROUND[1]

Plaintiff-Relator Stephen Grant is a board-certified physician who has practiced sleep medicine at Iowa Sleep Disorders, P.C. ("Iowa Sleep") since August 2009.  Defendant Steven Zorn is the majority owner of Iowa Sleep and Iowa CPAP, L.L.C. ("Iowa CPAP").  Zorn founded Iowa CPAP, a company that provides medical equipment and supplies for sleep apnea and other respiratory disorders, in January 2011.  As part of his medical practice at Iowa Sleep and employment arrangement with Zorn, Grant obtained a 10% interest in both companies on June 17, 2014.  The parties agree that Iowa Sleep accepts state and federal funds by providing services to treat sleep disorders through government reimbursement programs like Medicaid, Medicare, and Tricare.

Billing for services rendered through government healthcare programs depend on a variety of factors, including the type of visit, complexity of the review, and time spent with the patient, among others.  Claims for new patient visits are billed at codes 99201 through 99205; claims for

---

[1] Numerous deficiencies in the parties' submissions hinder the Court's review of the evidence submitted in support of and opposition to their motions for summary judgment.  For one, Local Rule 56 clearly requires that "[a] response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record."  LR 56(b).  "Local Rule [56] exists to prevent a district court from engaging in the proverbial search for a needle in the haystack."  *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) (citation omitted).  Yet Relator often fails to cite to the record in resisting Defendants' assertions of undisputed material fact.  Those statements are therefore deemed admitted for purposes of this Order.  *See* LR 56(b).  Inexplicably, Relator also fails to cite to the record in support of many of his own assertions of undisputed material fact.  *See* LR 56(a).  And although Defendants do not object, those statements that do include citations to the record commonly refer to documents that have not been properly authenticated.  *See* LR 56(e) ("A document included in an appendix must be authenticated properly, by affidavit or in some other lawful manner, or it may not be considered by the court in ruling on a motion for summary judgment.").  Thus, those assertions that are not expressly admitted by Defendants or immediately apparent from the record are deemed to lack evidentiary support for purposes of evaluating the motions pending before the Court.  *See generally* LR 56.

established patient visits are billed at codes 99211 through 99215. [ECF No. 52-3 at 7–8]. Claims for service submitted to the government for reimbursement are overseen by the operational division of United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS"). CMS contracts with third-party administrators like AdvanceMed to administer, process, and pay valid claims to qualified providers and to review, investigate, and audit payments made on behalf of the federal government. *See generally* 42 U.S.C. §§ 1395kk-1(a), 1395ddd(a)–(b). CMS, through AdvanceMed, also provides guidelines and requirements on the descriptions and documentation for various billing codes. [ECF Nos. 51-3 at 28–29; 68-3 at 2–14]. Codes 99204 and 99205 are the codes with highest reimbursement rates for new patient visits, while codes 99214 and 99215 are the codes with highest reimbursement rates for established patient visits. *See* [ECF No. 52-3 at 7–11]. The higher the reimbursement rate, the more documentation that is needed to satisfy the billing requirements. *See id.*

On September 6, 2016, AdvanceMed sent a letter addressed to the attention of Dr. Zorn at Iowa Sleep concerning billing practices it had observed in claims for reimbursement the company had submitted to the federal government. [ECF No. 51-3 at 27–32] (the "September 2016 Letter"). An analysis of Dr. Zorn's billing practices from June 24, 2012, through June 24, 2016, revealed that Dr. Zorn had billed code 99205 for 100% of his new patient visits and noted that "more variety would be expected." [ECF No. 51-3 at 28]. The letter also observed that the majority of his established patient office visits were billed at codes 99214 and 99215—the highest available levels of billing. *Id.* Code 99214, alone, constituted 76% of Dr. Zorn's established patient billing for that time period. *Id.* In addition, the letter pointed out that Dr. Zorn was "ranked number one" among all Iowa Medicare providers in claims involving billing codes 95810 and 95811, used for polysomnography (sleep study) services, and that "some beneficiaries received three or more sleep

studies for dates of service." *See id.* at 30–31. The September 2016 Letter concluded by informing Dr. Zorn the documentation submitted in support of these claims was insufficient to support his billing practices for that time period and educating his office on the criteria for billing at these rates. *See id.*

AdvanceMed sent another letter addressed to the attention of Dr. Zorn at Iowa Sleep on January 22, 2018, to present its findings from a follow-up program integrity review and provide his office "additional education." [ECF No. 51-3 at 33–38] (the "January 2018 Letter"). AdvanceMed reviewed thirty-three claims for services rendered between January 25 and September 2, 2017, and identified a Medicare overpayment of $866.66. *Id.* at 34–35. Like AdvanceMed's earlier letter, the January 2018 Letter observed that Zorn had billed code 99205 100% of the time for new patients and code 99214 76% of the time for established patients. *Id.* at 34. This resulted in AdvanceMed's general finding that the documentation submitted in support of Dr. Zorn's billing during this time period did not support the level of service for which he had billed. AdvanceMed provided several examples of claims that lacked sufficient documentation to support the level of billing he had submitted. *See id.* Most of the services reviewed by AdvanceMed "were billed at higher levels than necessary, according to the scored documentation," and "[s]ome of the documentation was found to be copied or templated." *Id.* at 35. In addition, AdvanceMed noted "some of the office visits were separated by less than one month, with no health status changes, which would not dictate the need for a comprehensive history and physical exam" that would be required in order to bill at such high levels for established patient visits. *Id.*

Relator initiated the present action by serving his original *Qui Tam* Complaint on the federal government on March 26, 2018. [ECF No. 1]; *see also* 31 U.S.C. 3730(b)(2). The United States served information requests upon Dr. Zorn, Iowa Sleep, and Iowa CPAP, but ultimately

declined to intervene.  *See* [ECF No. 12].  On September 17, and again on September 20, 2018, Dr. Zorn proposed that he and Grant take a 75% reduction in pay due to unspecified "business losses" and unexplained "dire financial conditions" of Iowa Sleep and Iowa CPAP.  [ECF No. 8-1]. Relator declined and, as a partial owner of the companies, asked to review the companies' financial records.    [ECF No. 8-2].    Instead, Dr. Zorn terminated Relator's employment on September 28, 2018.  [ECF Nos. 8-3; 8-4].

In brief, Relator alleges Dr. Zorn would bill for services at a higher rate of reimbursement than the circumstances warranted—a process known in the medical field as "up-coding"—thereby submitting false claims to Medicare and Medicaid, defrauding the United States and the State of Iowa.  But he also describes a scheme by which he claims Dr. Zorn would perpetuate business for himself through his medical equipment company, Iowa CPAP.  Relator claims Dr. Zorn would engage in a similar practice—known as "up-scoring"—whereby Dr. Zorn would baselessly order sleep studies for his patients and enter false information or alter their results just enough to rise to a level that could justify CPAP interventional therapy.  He alleges Dr. Zorn would then self-refer the patient directly to Iowa CPAP, a company in which he owns a significant financial interest, to provide those services.  Doing so would then necessitate follow-up visits at Iowa Sleep, generating further business for both companies under false pretenses.

The Third Amended *Qui Tam* Complaint brings four claims against Defendants.  Count I alleges Defendants knowingly submitted false claims for payment and made false statements of material fact to the United States government, in violation of the FCA, 31 U.S.C. § 3029(a)(1)(A) and (B).  Count II levies identical allegations under the Iowa False Claims Act ("Iowa FCA" or "IFCA"), Iowa Code § 685.2(1).  In Count III, Relator alleges Defendant Zorn knowingly solicited and directed referrals to Iowa CPAP from Iowa Sleep, both companies in which he has a financial

interest, as derivative FCA violations under the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), (g), and Stark Law, 42 U.S.C. § 1395nn(a), (g). Count IV alleges wrongful termination and unlawful whistleblower retaliation in violation of 31 U.S.C. § 3730(h) and Iowa law. [ECF No. 59].

Presently before the Court are four pretrial motions. Defendants move for partial summary judgment, urging that the "public disclosure bar" requires dismissal of Relator's *qui tam* action under the FCA and further arguing they are entitled to judgment as a matter of law on the claims in Count III premised on the Anti-Kickback Statute and Stark Law. [ECF No. 51]. Relator, in turn, seeks partial summary judgment on part of his core fraudulent billing claim in Count I. [ECF No. 52]. In addition to resisting Relator's motion, Defendants seek to exclude the expert report of his expert, Dr. Nizar Suleman. [ECF No. 69]. Finally, Relator seeks sanctions under Rule 11 of the Federal Rules of Civil Procedure for representations he claims Defendants made to the Court in bad faith.

## II.    SUMMARY JUDGMENT

### A.  Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."

*Anderson*, 477 U.S. at 255.  To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The evidence is viewed "in the light most favorable to the nonmoving party" and all reasonable inferences that can be drawn from the record are construed in that party's favor.  *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)).

## B.  *"Up-Coding" Claims*

The Court turns first to Relator's fraudulent billing claims based on the practice of "up-coding."  The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to the federal government.  31 U.S.C. § 3729(a)(1)(A)–(B); *accord* Iowa Code § 685.2(1)(a)–(b).  Defendants contend Relator's allegations on this front are barred by the "public disclosure bar."[2] Plaintiff resists and moves for partial summary judgment.

---

[2] In his opening argument Relator contends judicial estoppel precludes Defendants' summary judgment motion in its entirety.  Deadlines in this case had previously been extended several times whereby the time to file dispositive motions elapsed prior to the close of discovery.  Defendants sought a further extension for time to file a motion for summary judgment—more than one week after the dispositive motion deadline had expired—representing to the Court that counsel had inadvertently overlooked the deadline discrepancy while the pandemic and personal issues had hindered discovery; without a chance to review all of the discovery in the case, they said, the filing of any dispositive motion "would not have been in good faith."  *See* [ECF No. 44 ¶ 8]; *see generally* [ECF No. 40].

The Court rejects Relator's argument outright.  Relator has not demonstrated that Defendants' "inconsistent position would derive an unfair advantage or impose an unfair detriment" upon Relator if not estopped.  *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001).  The deadline was extended due to the impact of the Covid-19 pandemic on the progression of the litigation and the fact that Relator had previously been granted additional time to take discovery

1.  Public disclosure bar

The Court first considers Defendants' affirmative defense.  The FCA's "public disclosure

bar" provides:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
>> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>>
>> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>>
>> (iii) from the news media.
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4).[3]  "Dismissal under the public disclosure bar is thus required if (1) the

defendant has shown public disclosure under § 3730(e)(4)(A), and (2) the relator does not

---

on this basis.  [ECF No. 45 at 2].  The Court further observes that Relator, too, neglected to file a dispositive motion before the prior deadline elapsed yet at the same time seeks to take advantage of the extension for himself with his own motion for partial summary judgment.  Plaintiff was not prejudiced.  Whether framed as judicial estoppel or Rule 11 sanctions, *infra* at 25–26, striking Defendants' motion is not appropriate.

[3] Due to the change in statutory language with the passing of the Patient Protection and Affordable Care Act § 10104(j)(2), Pub. L. 111–148, 124 Stat. 119, 902 (Mar. 23, 2010), "[t]he federal courts of appeals that have confronted the issue have unanimously held that the 2010 'amendments transformed the public disclosure bar from a jurisdictional bar to an affirmative defense.'"  *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 737 n.1 (10th Cir. 2019) (citation omitted); *accord United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 843 n.3 (6th Cir. 2020); *United States ex rel. Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir.), *cert denied*, 137 S. Ct. 2309 (2017); *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 40 (4th Cir. 2016); *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3d Cir. 2016); *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 810 (11th Cir. 2015); *cf. United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 136 n.1 (1st Cir. 2020) ("The public disclosure bar was jurisdictional in nature until the FCA was amended through the Patient Protection and Affordable Care Act of 2010 ("PPACA").").

fit § 3730(e)(4)(B)'s definition of 'original source.'" *United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 692 (8th Cir. 2014). Defendants contend the FCA's public disclosure bar precludes Relator's "up-coding" fraudulent billing claims because the alleged fraud was publicly disclosed through AdvanceMed's September 2016 and January 2018 Letters and Relator is not an original source of the information.

Assuming without deciding the Letters qualify as a government "audit" or "investigation," let alone one that is sufficiently "public" to constitute a disclosure under the act, neither discloses "substantially the same allegations" of the fraud alleged in Relator's *Qui Tam* Complaint.[4] To trigger the preclusive effect of § 3739(e)(4)(A), "a public disclosure must reveal both the true state of facts and that the defendant represented the facts to be something other than what they were." *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1044 (8th Cir. 2002). The bar applies "only when 'the critical elements of the fraudulent transaction themselves [are] in the public domain.'" *United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 947 (8th Cir. 2017); *see also United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 512 (6th Cir. 2009) ("[A] public disclosure reveals fraud if 'the information is sufficient to put the government on notice of the likelihood of related fraudulent activity.'").[5] Although the Letters certainly reveal what

---

[4] Relator contends the CMS Letters cannot constitute public disclosures because they were not made by a government entity, but by AdvanceMed. This argument is specious. CMS is the real party in interest in any activity concerning the administration of the Medicare Program, 42 C.F.R. § 421.5(b), and AdvanceMed acts on behalf of CMS as an agent of the federal government, *see* 42 U.S.C. § 421.5(b).

[5] A mathematical illustration laid out by the United States Court of Appeals for the D.C. Circuit explains what is required to publicly disclose *fraud* as opposed to simple *malfeasance*:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.,* the

AdvanceMed had determined to be a suspicious pattern in Dr. Zorn's coding practices and a recurring lack of documentation to support his higher billing rates, the Letters did not reveal any indication of *intentional* fraudulent misrepresentations sufficient to disclose his scienter. The false state of facts was disclosed by the Letters insofar as they pointed out the inaccuracies of the billing. To establish liability under § 3729(a)(1)(A) or (B), however, Relator is required to prove the "true state of facts" was that the claims submitted were *knowingly* false. Though such showing does not require proof of his specific intent to defraud, Relator must establish that Dr. Zorn had actual knowledge of their falsity, acted in deliberate ignorance of their truth or falsity, or recklessly disregarded their truth or falsity. 31 U.S.C. § 3729(b)(1).

The Letters make no such accusation. To the contrary, on their face both Letters are remedial in nature. The September 2016 Letter discloses only the need for Dr. Zorn and his staff to receive "additional education" regarding Evaluation and Management (E/M) service and Polysomnography services. [ECF No. 51-3 at 27, 33]. And although the January 2018 Letter broaches the subject of fraud and warns Dr. Zorn that he "may be subject to civil or criminal

---

conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

  . . .

*[Q]ui tam* actions are barred only when enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y), or the allegation of fraud (Z).

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994). The Eighth Circuit has implicitly endorsed this construction. *See United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1512 (8th Cir. 1994) (citing *Springfield*, 14 F.3d at 653–54); *see also id.* at 1525 (MacGill, J., dissenting) ("Although not considered by the *Springfield* court, scienter is a required element of an FCA violation. When the hypothetical is revised to reflect all the required elements of an FCA violation, it becomes: W (scienter) + X (false representations) + Y (true facts) = Z (fraud)." (citation omitted)).

liability" if he were to "misrepresent, falsify, or conceal essential information required for payment of federal funds," *id.* at 36, the Letter is clear its purpose was to "serve[] as additional education," point out overpayments on a sampling of submissions, and inform that "AdvanceMed will continue to monitor future Medicare claim submissions in order to verify adherence to this education, *id.* at 33, 35, 37. The "true state of facts" alleged by Relator, i.e. *knowingly false* billing, was not publicly disclosed—only the fact of *inaccurate* billing was revealed. *See, e.g.*, *Heartland Hospice, Inc.*, 960 F.3d at 844 (OIG report "does not itself constitute a public disclosure" because it did not "carry an inference of wrongdoing," rather, the report "call[ed] out what it perceive[d] to be a compliance problem stemming from the technical nature of the claims process" and "recommended . . not an investigation, but instead better education, training, and monitoring"; there was "no insinuation of fraud, but at most noncompliance"); *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 867 (7th Cir. 2011) ("[A]lthough bills for services never performed likely reflect fraud, miscoded bills need not; the errors may have been caused by negligence rather than fraud (which means intentional deceit)."); *cf. Minn Ass'n of Nurse Anesthetists*, 276 F.3d at 1043–44 (public disclosure through certain identical allegations of fraud in parallel antitrust lawsuit and newspaper coverage of that suit, but not through audit concerning other discrete practices that were not specifically alleged to be fraudulent). Because they do not expressly allege fraud or establish that Dr. Zorn had actual knowledge of the falsity of his billing practices, acted in deliberate ignorance of their falsity, or recklessly disregarded it, the Letters cannot alone satisfy the requirements of the public disclosure bar to preclude Relator's claims as a matter of law.

Defendants' bid to preclude Relator's suit under the IFCA suffers an additional deficiency. Though parts of the federal and state statutes are "nearly identical," [ECF No. 51-1 at 11],

Defendants fail to appreciate the difference in statutory language concerning the public disclosure bar.  Under the IFCA:

> A court shall dismiss an action or claim under this section, unless opposed by the *state*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed in a *state* criminal, civil, or administrative hearing in which the *state* or an agent *of the state* is a party; in a *state* legislative, *state* auditor, or other *state* report, hearing, audit, or investigation; or by the news media, unless the action is brought by the attorney general or the *qui tam* plaintiff is an original source of the information.

Iowa Code § 685.3(5)(c) (emphasis added); *see also id.* § 685.1(11) ("'Original source' means an individual who prior to a public disclosure under section 685.3, subsection 5, paragraph "c", has voluntarily disclosed to the *state* the information on which the allegations or transactions in a claim are based; or who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and has voluntarily provided the information to the *state* before filing an action under this chapter." (emphasis added)).  Defendants advance no evidence of *state* report, hearing, audit, or investigation that revealed fraudulent overbilling by Dr. Zorn. For this additional reason, dismissal of Relator's parallel claims under the IFCA is not warranted under the public disclosure bar.

## 2.  Fraudulent billing

Turning to the merits, Plaintiff seeks affirmative judgment on his FCA and IFCA claims in Counts I and II.  The IFCA contains identical language to its federal counterpart regarding the requirements necessary to establish a *prima facie* case, so the Court applies the same standard to both.  *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 916 n.1 (8th Cir. 2014).

Counts I and II plead two different theories under the federal and state false claims acts: a "presentment" violation under § 3729(a)(1)(A) and Iowa Code § 685.2(1)(a), and a "false

certification" violation under § 3729(a)(1)(B) and Iowa Code § 685.2(1)(b).  *See* [ECF No. 59 ¶¶ 82, 86] (alleging Defendants "(i) knowingly presented, or caused to be presented, . . . a false or fraudulent claim for payment or approval"; and "(ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the . . . Government").  Relator appears to move for summary judgment only on his "presentment" claim, *see* [ECF No. 52-1 at 2], so the Court limits its analysis to that theory of recovery.  To prevail under § 3729(a)(1)(A), Relator must establish "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."  *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1070 (8th Cir. 2016) (citation omitted).

At a minimum, genuine disputes of material fact exist as to whether Dr. Zorn knew the claims submitted were false or fraudulent.  "Innocent mistakes and negligence are not offenses under the [FCA].  In short, the claim must be a lie."  *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 500 (8th Cir. 2016) (citation omitted).  Relator advances many strong inferences that the submitted claims were knowingly "up-coded" and therefore false.  Dr. Zorn continued to bill 100% of his new patient visits at code 99205 even after being "educated" by AdvanceMed's September 2016 Letter.  [ECF No. 51-3 at 34].  Defendants' own expert, Dr. Alexander, agrees that assuming the time requirements for the 31 sampled claims during the relevant time period were met, only 7 (22%) were coded accurately.  *See* [ECF No. 68-1 ¶¶ 12–13].  Plaintiff's fraud and billing compliance expert, Stacy Niemann, states Dr. Zorn's rate of false billing is highly indicative of intentional fraud, not negligence or mistake.  [ECF No. 66-1 at 200–02].  And based on his practical experience in the medical field, Dr. Suleman, Relator's

sleep medicine expert, agrees Dr. Zorn's billing practices are highly suspicious and would be unlikely to be the product of mere mistake. *See* [ECF No. 66-1 at 178–79].

These inferences, however, are nevertheless unable to overcome Dr. Zorn's continued assertion that each coded treatment was medically necessary, *see* [ECF No. 68-3 at 15–19], and the expert opinion of Dr. Alexander that the irregularities in the coding pattern for "very specialized physicians [like Dr. Zorn] is not uncommon," *id* at 64–65. Indeed, "[q]uestions such as 'scienter,' 'gross negligence,' or 'recklessness' rest heavily on credibility, and for that reason are rarely appropriate for summary judgment." *United States ex rel. Raggio v. Jacintoport Int'l, LLC*, Civil Action No. 10-01908 (BJR), 2013 WL 12321941, at *7 (D.D.C. Dec. 23, 2013); *cf. Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1029 (11th Cir. 2017) ("In fraud cases . . . summary judgment 'is rarely proper as the issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge." (citation omitted)); *Perez v. Alcoa Fujikura, Ltd.*, 969 F. Supp. 991, 1009 (W.D. Tex. 1997) ("[S]ummary judgment is rarely proper in [fraud] cases because '[i]ntent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given their testimony.'" (citation omitted)).[6] Summary judgment is inappropriate to determine Dr. Zorn's state of mind and adjudicate his liability under a presentment theory of the FCA in this case.

---

[6] Relator fails to respond to Defendants' contention that CMS's billing guidelines are ambiguous and Dr. Zorn's contention that his billing practices were the product of his reasonable interpretation of their requirements. *See United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013) (noting the "reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA"). An FCA defendant's state of mind is a matter for the jury where there is "sufficient evidence of government guidance that 'warn[ed] a regulated defendant away from an otherwise reasonable interpretation' of an ambiguous regulation." *See U.S. ex rel. Donegan v. Anesthesia Assocs. of Kansas City*, 833 F.3d 874, 879 (8th Cir. 2016).

### C. Kickback and Self-Referral Claims

Defendants also seek summary judgment on Count III, arguing that Relator has failed to advance sufficient evidence of an illegal kickback and self-referral scheme as a matter of law.

The federal Anti-Kickback Statute ("AKS") prohibits soliciting or receiving anything of value in exchange for a referral of medical service. *See* 42 U.S.C. § 1320a-7b(b)(1). The Stark Law broadly prohibits physicians from making referrals to hospitals, clinics, or other entities in which they have a financial interest. *See* 42 U.S.C. § 1395nn(a)(1). "A claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim" for purposes of FCA liability. 42 U.S.C. §§ 1320a-7b(g). The Stark Law provides that "[n]o payment may be made under [Medicare] for a designated health service which is provided in violation" of its prohibitions, *id.* § 1395nn(g)(1), and courts recognize that a claim resulting from a prohibited referral can similarly constitute a false or fraudulent claim for FCA purposes, *see, e.g.*, *United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 396 n.2 (4th Cir. 2012); *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).[7]

The Third Amended *Qui Tam* Complaint does not state whether Relator pursues AKS and Stark Law violations under the FCA through a "presentment" theory or a "certification" theory, but the parties appear at times to argue both. Discussed above, Relator must prove Defendants

---

[7] Though by its express terms the prohibitions of the Stark Law apply only to Medicare, Defendants concede its referral prohibitions also apply to Medicaid through 42 U.S.C. § 1396b(s). [ECF No. 51-1 at 9–10]; *see also United States v. All Children's Health Sys., Inc.*, No. 8:11-cv-01687-T-27EAJ, 2013 WL 6054803, at *5 (M.D. Fla. Nov. 15, 2013) (citing *Fresenius Med. Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1367 (N.D. Fla. 2011)) (noting § 1396b(s) prohibits federal reimbursement payments to states when the service was provided "on the basis of a referral that would result in the denial of payment for the service under subchapter XVIII of this chapter" and that "Subchapter XVIII governs the Medicare program, including the Stark Amendment").

submitted a claim to the government they knew to be false or fraudulent to prevail under a "presentment" theory of the FCA. *Olson*, 831 F.3d at 1070. To prove a violation on a "false certification" theory under § 3729(a)(1)(B) and Iowa Code § 685.2(1)(b), Relator must demonstrate "(1) the defendant made a 'false record or statement'; (2) the defendant knew the statement was false; (3) the statement was material; and (4) the defendant made a 'claim' for the government to pay money or forfeit money due." *Weston Educ., Inc.*, 840 F.3d at 500. "There is no 'presentment' requirement for a § 3729(a)(1)(B) claim. However, [Relator] must '[demonstrate] a connection between the alleged fraud and an actual claim made payable to the government.'" *United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 741 (8th Cir. 2020) (quoting *United States ex rel. Strubbe v. Crawford Cty. Mem Hosp.*, 915 F.3d 1158, 1166 (8th Cir. 2019)).

### 1. Anti-Kickback Statute

The Anti-Kickback Statute prohibits medical providers from paying another to "refer an individual . . . for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). "An AKS violation that results in a federal health care payment is a per se false claim under the FCA." *United States ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017). If there is "sufficient causal connection" between the illegal referral and a claim submitted for government reimbursement, that claim is a false claim within the meaning of the FCA. *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019). Alternatively, "[i]f a provider has violated the statute, then claims he or she submits to Medicare may be false claims when the provider certified compliance with the kickback statute in submitting a claim." *United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 371 (5th Cir. 2017).

Relator advances no evidence of an illegal kickback made in connection with a false claim submitted to the state or federal government. "Remuneration" is defined as "any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind." 42 C.F.R. § 411.531. The statute requires that the remuneration be received "in return" for a referral or paid "to induce" such referral. 42 U.S.C. § 1320a-7b(b)(1), (2). Here, Relator describes nothing of value received by Dr. Zorn and Iowa Sleep or paid from Iowa CPAP in exchange for specific referrals to the medical equipment entity. Although the record suggests that Iowa CPAP provided loans to Iowa Sleep to cover its operation expenses, *see* [ECF No. 66-1 at 88], Relator fails to advance evidence tending to show that these were payments made specifically in return "for the furnishing or arranging" of service referrals. *See United States v. Iqbal*, 869 F.3d 627, 630 (8th Cir. 2017). Relator merely describes a scheme by which Dr. Zorn's own financial interests in generating additional business for the success of both companies he controlled dictated his referrals. *See* [ECF No. 59-4 at 1]. Accordingly, this aspect of Relator's claim must be dismissed.

## 2. Stark Law

Though not cognizable as a kickback, Relator's allegations resemble an impermissible self-referral scheme prohibited by the Stark Law. Under 42 U.S.C. § 1395nn(a)(1)(A), a physician may not refer Medicare patients to an entity for "designated health services" if the referring physician has a nonexempt "financial relationship" with such entity. *See also* 42 C.F.R. §§ 411.353, .354, .355. Under § 1395nn(a)(1)(B), the referral entity is prohibited from presenting or causing to be presented a Medicare claim for services furnished pursuant to a prohibited referral. *See generally United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 239 n.6 (3d Cir. 2004).

Defendants argue that Relator's FCA claim predicated by Stark Law violations "fail[] for the simple reason that Iowa CPAP does not accept Medicare or Medicaid patients." [ECF No. 76

at 9]; *see* [ECF No. 51-1 at 10–11]. Relator fails to rebut Defendants' assertion that Iowa CPAP does not accept Medicare or Medicaid patients. [ECF No. 66 at 6]; *see* LR 56(b) ("The failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact."). But deposition testimony shows Iowa CPAP has accepted Tricare patients, and Defendants concede the Stark Law could apply. *See* [ECF No. 66-1 at 113‒14]. Defendants do not appear to move for summary judgment on Relator's Stark Law claims against Dr. Zorn and Iowa Sleep, which does accept Medicare and Medicaid patients. *See generally* [ECF No. 52-3 at 32–56]. Defendants have therefore failed to establish they are entitled to judgment as a matter of law on Relator's Stark Law-predicated claims under the FCA.

## III.    EXPERT WITNESSES

In connection with their resistance to Relator's motion for partial summary judgment, Defendants move to exclude the opinions of Relator's expert, Dr. Nizar Suleman. Dr. Suleman is a physician practicing in pulmonary, critical care, and sleep disorders medicine. [ECF No. 52-3 at 5]. In his report, Dr. Suleman expressed the following opinions challenged by Defendants: (1) Dr. Zorn's billing practices for new and established patients "likely represent systematic overbilling"; (2) Dr. Zorn overbilled Medicare and Medicaid in the total amount of $549,171.18; (3) Dr. Zorn and Iowa Sleep improperly referred CPAP patients to Iowa CPAP, a company in which Dr. Zorn has a financial interest; (4) Dr. Zorn fired Relator as retaliation for bringing this lawsuit. [ECF No. 52-3 at 22–27].

Expert witness testimony is governed by Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court's gatekeeping function requires it to ensure expert opinions "rest[] on a reliable foundation and is relevant to the task at hand." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). Expert testimony must be "supported by the kind of scientific theory, practical knowledge and experience, or empirical research and testing" that facilitates such an assessment. *Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998). Expert opinions are typically excluded "only if it is so fundamentally unsupported that it cannot help the factfinder." *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989). Accordingly, "[d]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Williams v. Wal-Mart Stores, Inc.*, 922 F.2d 1357, 1360 (8th Cir. 1990) (citation omitted). As the party offering the opinions, Relator bears the burden of demonstrating Dr. Suleman is "qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006).

Defendants first contend Dr. Suleman is not qualified to offer an opinion that "Dr. Zorn's billing practices for new and established patients likely represent systematic overbilling (upcoding)." In forming this opinion, Dr. Suleman compares Dr. Zorn's billing rate for new and established patients to publicly-available data on Medicare average billing rates and observes

Dr. Zorn's rate of billing codes 99205 and 99215 are "well above" those averages. *See* [ECF No. 52-3 at 12–16]. Defendants argue Dr. Suleman misuses this data and fails to perform the complex statistical analysis they claim is required to make such a comparison scientifically sound. They also assert Dr. Suleman improperly bases his opinion in part on a comparison to his own billing rates and those of Relator's, providing a sample size too small from which to draw reliable conclusions. Finally, Defendants argue Dr. Suleman's opinion should be excluded because the conclusion is partially based on references to Dr. Zorn's billing practices evaluated in the Letters without knowledge of the claims underlying the government's review." *See* [ECF No. 52-3 at 22–23].

The Court agrees that Dr. Suleman is not a statistician, but as Relator points out, his opinion on this point is based on his review of the evidence in the record in light of his training, specialized knowledge, and experience in the medical industry billing government entities like Medicare and Medicaid for sleep medicine services. *See id.* at 5. Defendants misunderstand Dr. Suleman's expert report. Dr. Suleman does not set out to establish Dr. Zorn's guilt of fraudulent billing through a statistical analysis; he opines that, based on his specialized experience as a physician and knowledge of the industry, the circumstances surrounding Dr. Zorn's billing support an inference of fraud by suggesting his practices are out of the ordinary and do not resemble an honest mistake. Dr. Suleman's report and testimony is therefore admissible as an expert opinion to the extent it is based on his expertise as a physician in the field of sleep medicine. Defendants' objections on this point go primarily to the weight afforded to Dr. Suleman's opinion, not its admissibility, and are best contested through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" rather than total exclusion. *See Daubert*, 509 U.S. at 596.

Because he is not a statistician, however, the Court agrees that Dr. Suleman's conclusions on the total amount overbilled by Dr. Zorn do not qualify as expert opinion under Rule 702.   In arriving at his conclusion that Dr. Zorn overbilled $549,171.18, Dr. Suleman simply calculates the difference between Dr. Zorn's billing rates and the average number of 99205 and 99215 codes among all sleep medicine physicians nationwide, taking forty percent of that figure to approximate the forty percent of Dr. Zorn's patients who are insured by Medicare or Medicaid.   *See* [ECF No. 52-3 at 24].  This conclusion improperly assumes *every* claim billed by Dr. Zorn at the highest level of coding was false simply based on the fact that Dr. Zorn bills those codes at a higher rate than the average sleep physician.   It relies on no scientifically reliable calculations by which to approximate Dr. Zorn's total overbilling liability.   *See United States ex rel. Jackson v. DePaul Health Sys.*, 454 F. Supp. 3d 481, 492–93 (E.D. Pa. 2020) (excluding opinion of total false claims beyond the seven specifically reviewed because the expert "fail[ed] to perform any calculations, such as sampling or other statistical techniques, from which he could reliably extrapolate" such a figure).   Arriving at such a conclusion would require specialized or scientific analysis in which Dr. Suleman has no expertise, and therefore must be excluded.

In response to Defendants' motion and in support of Relator's opposition, Dr. Suleman produced a "supplemental" report opining on the same sample of thirty-one claims evaluated by Defendants' expert, Dr. James Alexander.   *See* [ECF No. 77-2].   In his own expert report, Dr. Alexander examined a random sample of thirty-one new patient claims submitted by Dr. Zorn to Medicare, Medicaid, or Tricare, *see* [ECF No. 52-3 at 32–57], their documentation and records, and the code at which Dr. Zorn billed, [ECF No. 52-3 at 69].   He concluded that of those thirty-one sample claims, only seven (22.6%) were billed accurately; assuming all patient encounters were given the full time of service recommended for that billing code, four additional claims (35.5%)

were supported.  *See id.* at 69–70.  In his additional report, Dr. Suleman states he examined those same thirty-one patient files and concluded that "the appropriate [billed] level of service for each patient encounter is equal to or lower than the code assigned by Dr. Alexander," reinforcing his opinion that "Dr. Zorn routinely bills the highest [code] level for all new patients."  [ECF No. 77-2 at 2–3].[8]

Defendants argue this filing is an untimely rebuttal report masquerading as a supplement that is improper under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, which provides that an expert report must contain a "complete statement of all opinions the witness will express and the basis and reasons for them" at the time it is disclosed.  An expert witness is required to supplement their report "in a timely manner" if he or she "learn[s] that in some material respect the information disclosed is incomplete or incorrect."  Fed. R. Civ. P. 26(a)(2)(E), (e).  A supplemental report is not an opportunity for an expert to offer new opinions, however, and is limited to updating the report based on information not previously available.  *See Wells v. Lamplight Farms, Inc.*, 303 F.R.D. 530, 536 (N.D. Iowa 2014) (citation omitted) ("[T]he Rule permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report.").

Contrary to Defendants' reading of Dr. Suleman's new report, it does not add new opinions. Dr. Suleman expressly affirms the opinion previously stated in his original report with his review of Dr. Alexander's thirty-one claim sample size.  But the Court agrees the report is untimely. Relator's deadline to disclose expert witnesses was on July 1, 2020.  [ECF No. 30].  Relator did

---

[8] Dr. Suleman does not state whether this "supplemental" review provides a sound basis by which to calculate damages.

not produce this supplemental report until January 6, 2021, and not until opposing Defendants challenge to Dr. Suleman's opinions. *See* [ECF No. 77-2].

Whether the supplemental report is based on "information that was not available at the time of the initial report" is another matter. Relator urges that he has requested patient files for months and even filed a motion to compel production of those patient files (which was later withdrawn), rendering them not available until now. That motion, however, was not brought until December 7, 2020. *See* [ECF No. 58]. Indeed, the record shows it is not the case that the information was not "not available," but simply that Relator "*did not ask for it*." *Wells*, 303 F.R.D. at 536. And even if it was reasonable for Relator not to request the patient files relied on by Dr. Alexander until after that report had been disclosed on September 1, 2020, the disclosure of his supplement did not occur until seven months after Relator's expert disclosure deadline, three months after the disclosure of Dr. Alexander's report, and three days after discovery closed. Even considered as a rebuttal expert report, Dr. Suleman's supplement was not timely. *See* [ECF No. 64] (setting expert rebuttal deadline of December 23, 2020).

A party that fails to provide or supplement an expert report as required by Rule 26(a) or (e) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1); *see also Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998). Even though untimely, Defendants do not explain how they are prejudiced by the disclosure. The expert deposition deadline was extended through February to allow Defendants to depose Dr. Suleman about this additional report. [ECF No. 81]; *see United States ex rel. Montcrieff v. Peripheral Vascular Assoc., P.A.*, --- F. Supp. 3d ---, 2020 WL 7342662, at *15 (W.D. Tex. Dec. 14, 2020). And the report produces no "new" opinions on information that was not previously disclosed to Defendants

because the supplement is based entirely on data turned over by Defendants themselves. Accordingly, the Court declines to exclude Dr. Suleman's supplemental report as untimely.[9]

Next, Defendants contend Dr. Suleman is not qualified to opine on Dr. Zorn's practice of referring CPAP patients exclusively to Iowa CPAP, a company in which Dr. Zorn has a financial interest. Although Dr. Suleman is not a compliance expert, and may not testify to the legal conclusion Dr. Zorn and Iowa CPAP violated the Anti-Kickback Statute or the Stark Law, *see Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 887 (8th Cir. 2012); *Williams*, 922 F.2d at 1360, he is competent to opine with his specialized knowledge as a physician in the field of sleep medicine regarding the propriety and practice of referrals. Dr. Suleman may testify on this subject to the extent it is based on his specialized experience in the field as a medical practitioner.

In regards to his opinion that Dr. Zorn fired Relator as retaliation for blowing the whistle on Dr. Zorn, Dr. Suleman offers no expertise in employment law that would assist the trier of fact, *see Robertson*, 148 F.3d at 908, and improperly invades the province of the jury by opining on a legal conclusion, *Williams*, 922 F.2d at 1360 (holding exclusion of expert testimony is warranted "if it is so couched in legal conclusion that it supplies the fact finder with no information other than what the witness believes the verdict should be"). This opinion must be excluded.

In sum, Dr. Suleman is qualified as an expert to the extent his report and testimony relate to his specialized knowledge in the practice of sleep medicine. Beyond analyzing specific claims submitted to the government and Dr. Zorn's billing practices and clinic setup, the Court agrees with Defendants that he presents no expertise in statistics or data analysis that would allow him to

---

[9] "Exclusion of evidence is a harsh penalty, and should be used sparingly." *ELCA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc.*, 53 F.3d 186, 190 (8th Cir. 1995). Even if exclusion is not warranted, "the court may issue any just orders . . . if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1).

opine on any topic beyond a medical basis, or on the amount of Defendants' alleged liability under the FCA based purely on his examination of Medicare averages and a comparison to his own billing rate.

## IV.    SANCTIONS

Finally, Relator asks the Court to sanction Defendants for their representations to the Court to justify extending the deadline by which to move for summary judgment. Described above, *see generally supra*, at 7–8 n.2, Defendants moved to extend the time to file dispositive motions after the deadline had already passed and represented to the Court that counsel had inadvertently overlooked the fact that a previous order extending discovery deadlines did not also extend the motions deadline, and that insufficient discovery had been taken to justify the filing of a good faith dispositive motion. *See* [ECF No. 44 ¶¶ 5–6, 8]; *see generally* [ECF No. 40]. Because Defendants took no further discovery, Relator contends their motion for summary judgment constitutes a baseless filing and Defendants "could not have believed that [it] was brought for a proper purpose." *See Landscape Props., Inc. v. Whisenhunt*, 127 F.3d 678, 684 (8th Cir. 1997).

Plaintiff's complaints do not establish counsel for Defendants intentionally made misrepresentations to the Court for an "improper purpose." *See* Fed. R. Civ. P. 11(b)(1). The dispositive motions deadline was extended numerous times on the behalf of both parties due to discovery delays, complications caused by the Covid-19 pandemic, and personal commitments. With additional discovery available, it is reasonable that Defendants would not know whether grounds existed to move for summary judgment until having a chance to evaluate all of the relevant evidence from written discovery and depositions that had not been completed. And counsel for Defendants admitted their mistake in believing Court's order had extended that deadline in addition providing more time to conduct discovery. Though Defendants ended up not taking any

more discovery, Relator did, and Relator offers nothing else to show this rationale was contrived.[10] Relator himself benefitted from this extension, enabling him to file his own dispositive motion.

Relator points to no specific sanction that would remedy his alleged injury beyond striking Defendants' motion for summary judgment. The Court declines to do so and denies his request for Rule 11 sanctions.

## V.    CONCLUSION

Based on the foregoing, the Court issues the following ruling:

Defendants' Motion for Summary Judgment, [ECF No. 51], is GRANTED in part. Count III is DISMISSED as to all Defendants insofar as it alleges violations of the False Claims Act predicated by the federal Anti-Kickback Statute. In all other respects the motion is DENIED.

Plaintiff's Motion for Partial Summary Judgment, [ECF No. 52], is DENIED.

Defendants' Motion to Exclude Dr. Nizar Suleman, [ECF No. 69], is GRANTED in part and DENIED in part consistent with the reasoning explained above.

Plaintiff's Motion for Rule 11 Sanctions, [ECF No. 83], is DENIED.

IT IS SO ORDERED.

Dated this 8th day of March, 2021.

_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT

---

[10] Defendants add that it was not until November 2020 that counsel discovered the "public disclosure bar" defense that formed the basis for the bulk of their motion under the FCA. *See* [ECF Nos. 76 at 10; 86 at 3]. Although Defendants' failure to conduct due diligence at the outset of this case and adequately read the statute forming the basis of this lawsuit would not excuse their otherwise untimely filing, this was not the basis upon which the deadline was extended.